UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )   Crim. No. 22-cr-10290-WGY |
| | ) |
| JASON DUHAIME, | ) |
| | ) |
| Defendant | ) |

**GOVERNMENT'S OPPOSITION**
**TO DEFENDANT'S MOTION TO SUPPRESS**

On September 13, 2022, defendant Jason Duhaime called 9-1-1 to report that when he opened a "Pelican case" in a lab at Northeastern University, it expelled "very sharp" objects that caused injuries to his hand. He also reported that the case contained a "violent note." Afterwards, the defendant willingly went with medical personnel to Beth Israel Deaconess Medical Center in Boston for evaluation. While there, the defendant twice agreed to be interviewed in his hospital room: first by two Boston Police detectives and, later, an FBI Task Force Officer accompanied by the Northeastern University police officer. All the officers were dressed in plain clothes, and none was visibly armed. They did not threaten or physically restrain the defendant, prevent him from receiving medical treatment, or extend his hospital stay in any way. The interviews were cordial and reasonable in length.

The defendant's Motion to Suppress presents two straightforward issues: *first*, would a reasonable person in these circumstances have believed he was at liberty to terminate the interviews or cause the officers to leave? And *second*, were the defendant's statements voluntary within the meaning of the Due Process Clause of the Fifth Amendment?

The answer to each of these questions is *yes*.   Considering the circumstances of the defendant's hospital interviews in their totality, a reasonable person would have believed he was free to terminate the interviews such that *Miranda* warnings were not required.  Likewise, nothing about the officers' conduct during the interviews, or the defendant's physical or mental condition at the time, suggests that his statements were involuntary.  The Court should therefore deny the defendant's Motion to Suppress.

### Relevant Facts[1]

On September 13, 2022, the defendant was working on the campus of Northeastern University ("NEU") in Boston, Massachusetts, as the director of the Immersive Media Lab (the "Lab"), one of several computer labs on campus used by undergraduate and graduate students.  At approximately 7:00 p.m. that evening, the defendant called 9-1-1 from inside the Lab and reported injuries to his "hand" caused by "very sharp" objects expelled from a plastic "Pelican case"—a type of hard plastic case commonly used to store electronic equipment—that he had opened inside the Lab.  *See* Exhibit 1.  The defendant also told the 9-1-1 operator that he discovered a "violent note" inside the case.  *Id.*

A NEU police officer was first to arrive at the Lab in response to the defendant's 9-1-1 call.  When the officer arrived, the defendant was seated at a table inside the Lab.  The Pelican case and the "violent note," which contained threatening language directed at the Lab and its employees, were on the table adjacent to the defendant.  Def. Memo. Exhibit A.  The defendant raised his sleeves for the officer—he was wearing a long-sleeve shirt—revealing several small, superficial marks on his forearms.  The defendant had no other apparent injuries.  The defendant told the officer that there was a second, unopened Pelican case inside the Lab's storage closet.

---

[1] To the extent any facts set forth herein are in dispute, the government will establish them through evidence at a hearing.

Fearing that that case could be rigged with an explosive device, the officer evacuated the Lab with the defendant.[2]

The defendant's 9-1-1 call—which, in essence, reported an explosion on a large, inner-city college campus—generated an enormous law enforcement response.  Multiple law enforcement agencies responded to NEU's campus both to investigate the call, and to mitigate any related dangers.  Because the defendant had reported injuries to his "hand," an ambulance was also dispatched to the Lab.  Paramedics first encountered the defendant outside the Lab on Leon Street, in the middle of the NEU campus.  In addition to the small marks on his forearms, the defendant told paramedics that he was experiencing "ringing in his ears."  Given the circumstances (*i.e.*, the defendant's claim that he had been injured by some type of "pressurized explosion" inside the Lab) and consistent with their training, paramedics elected to remove the defendant's clothing, dress him in a Tyvek suit, and transport him by ambulance to Beth Israel Deaconess Medical Center in Boston for further evaluation.  *See* Exhibit 2.  At no time did the defendant decline medical treatment, ask to leave the ambulance, or tell first responders that he did not want to go to the hospital.  *Id.*  The defendant arrived at the Beth Israel at approximately 7:50 p.m., less than an hour after he called 9-1-1.  *See* Exhibit 3 at 1.

Upon arriving at the hospital, the defendant underwent an initial assessment by medical personnel at a special trauma unit assembled outside of the emergency department to avoid the risk of contaminating other patients.  Notes of this initial assessment indicate that the defendant experienced a "pressurized explosion" under "suspicious circumstances" – namely a "black box" accompanied by "a note accusing NEU of wrongdoings."  *Id.*  The defendant's chief complaint

---

[2] Further investigation revealed that neither case contained explosive chemicals or residues.  Likewise, no evidence of any "sharp" objects was found inside the cases or elsewhere in the Lab.  As described in the Indictment, the government alleges that the defendant himself authored the "violent note" earlier in the day on September 13th, before he called 9-1-1.

was described as a "chemical burn," his pain was rated a "3/10," and his triage acuity was rated a "2/5." *See* Exhibit 3 at 1. Once the initial assessment was completed, hospital personnel decontaminated the defendant and screened him for radiation with negative results. *Id.* at 2. Around 8:32 p.m., hospital staff had moved the defendant to a room in the emergency department where he continued to be monitored. *Id.* at 3. By 9:09 p.m., the defendant's temperature, pulse, respiratory rate, and blood pressure were all normal, and medical staff did not indicate that the defendant was experiencing any pain. *Id.* at 2. Evaluation notes from around this time do not indicate that the defendant was in any acute distress. *Id.* at 3.

During the defendant's initial screening, two detectives from the Boston Police Department ("BPD") assigned to investigate the reported "pressurized explosion" arrived in the emergency department. Both detectives were dressed in plain clothes, and neither was visibly armed. Shortly after 9:00 p.m., after the defendant had been evaluated by medical personnel and moved to a room in the emergency department, the detectives approached the defendant and asked if he'd be willing to answer questions about the reported explosion. The defendant was seated on a hospital bed adjacent to the detectives throughout the interview, which was recorded. The interview was cordial and non-accusatory. *See* Exhibit 4 (audio recording).[3] The detectives did not touch or restrain the defendant in any way. The defendant never asked to terminate the interview, nor did he complain that he was hungry, thirsty, or in pain. *Id.*; *see also* Def. Memo. Exhibit D (interview transcript). Throughout the interview, the defendant maintained, in substance, that he was the victim of a pressurized explosion caused by an unknown actor or actors, adding that he observed a suspicious person near the Lab several hours before the explosion who "looked like Michael Jackson." Def. Memo. Exhibit D at 9-10. The interview lasted approximately fourteen minutes, concluding at

---

[3] The audio recording of the interview has been copied to a CD labeled "Exhibit 4," which the government will provide to the Court.

roughly 9:18 p.m.  *Id.* at 10.  The detectives then left the defendant's room.  Throughout the interview, the detectives viewed the defendant as a victim, not a suspect, and their report of the interview referred to the defendant as "the victim."  *See* Exhibit 5.

After the BPD interview ended, at approximately 9:21 p.m., medical personnel again checked on the defendant.  Notes from this encounter do not reflect any change to the defendant's condition since his last evaluation approximately twenty minutes earlier.  *See* Exhibit 3 at 3.  At approximately 10:00 p.m., a Task Force Officer ("TFO") with the FBI's Joint Terrorism Task Force, TFO Connelly, and a detective from the NEU Police Department, Detective Nocerino, arrived at the emergency department hoping to interview the defendant about the reported explosion.  Def. Memo. Exhibit E.  Both officers were dressed in plain clothes, and neither was visibly armed.  They entered the defendant's room, asked the defendant if he was willing to answer question, and asked if he consented to the conversation being recorded.  *Id.*  The defendant agreed and, at approximately 10:07 p.m., the interview began.  *Id.*  The door to the defendant's hospital room remained open at all times during the interview.  The officers did not touch the defendant, physically restrain him in any way, or prevent medical personnel from treating him.[4]  Likewise, the defendant never asked for food or drink, never indicated that he was in pain, never asked to take a break (although he was offered one roughly six minutes into the interview), and never asked to terminate the interview.  *See* Exhibit 6 (audio recording)[5]; Def. Memo. Exhibit F (interview transcript).  In substance, the defendant told the officers that he was the victim of some type of

---

[4] At the very outset, TFO Connelly asked if the defendant felt "up to talking."  Def. Memo. Exhibit F at 3.  The defendant said he was.  *Id.* at 3.  TFO Connelly also told the defendant, should the need arise, to "just tell us, 'Guys hang on a second,' [and] we'll get one of the doctors [or] one of the nurses."  *Id.* at 3-4.  The defendant never asked for a doctor or a nurse during the interview.  *See generally id.*

[5] The audio recording of the interview has been copied to a CD labeled "Exhibit 6," which the government will provide to the Court.

pressurized explosion. *See generally* Def. Memo. Exhibit F.  The defendant maintained his story even after being politely confronted by TFO Connelly about whether he was withholding information, telling the TFO Connelly, "I absolutely know this is not personal, and I don't mind the, the grilling or whatever.  I get it, you know, this is your job…." *Id*. at 90.[6]

The interview concluded at approximately 11:30 p.m., at which time the officers left the defendant's room.  A few minutes after midnight on September 14, 2022, they returned to the defendant's room to ask some additional clarifying questions.  *See* Def. Memo. Exhibit E.   That interview, which was also recorded, ended at approximately 12:20 a.m.  *Id*.  Between 12:10 a.m. and 2:16 a.m., the defendant remained in the emergency department.  *See* Exhibit 3 at 3-4.  At 2:16 a.m., hospital staff provided the defendant with a sandwich, crackers, and ginger ale.  *Id*. at 4.  The defendant remained hospitalized until 3:42 a.m. on September 14th, when he was discharged.  *Id.* According to medical records, the only medication the defendant received during his hospital stay was Tylenol at 2:16 a.m., some six hours after he first arrived at the hospital.  *Id*.  The defendant's injuries were described as "unimpressive" and he required no follow-up care.  *Id*. at 7.

Later in the day on September 14, 2022, the defendant called the NEU Police Department two times—once at 10:52 a.m. and again at 12:30 p.m.—and asked to speak with Detective Nocerino.  During the second call, the defendant told the officer who fielded the call that a reporter had contacted him and asked whether he had fabricated the incident.  He also said that he was staying at the Best Western Hotel in Quincy.  At approximately 2:00 p.m. that same day, TFO Connelly and Detective Nocerino arrived at the Best Western and spoke with the defendant.  Def. Memo. Exhibit G.  The conversation was recorded.  *Id*.  The following exchange occurred at the outset:

---

[6] The audio recording of the interview, Exhibit 6 to this opposition, reflects that TFO Connelly's tone throughout the interview was conversational and professional.

| | |
|---|---|
| **TFO Connelly**: | Uh just a couple ground rules just so that way there's no misunderstandings. You called us, we're happy to sit down and talk about whatever you'd like today. |
| **Defendant:** | Yup, yup. |
| **TFO Connelly:** | This is your room. |
| **Defendant**: | Yeah. |
| **TFO Connelly:** | If you at any point decide you don't want to talk to us— |
| **Defendant**: | No I want to talk to you. |
| **TFO Connelly:** | You can tell us you guys don't wanna – that's – I just wanna make sure you understand this is entirely your decision, you're driving the bus on this. |
| **Defendant:** | Yeah, yeah…. |

Def. Memo Exhibit H at 3-4. During the conversation, among other things, the defendant complained about the media contacting him, denied fabricating the incident, and told the officers that his statements from the night before were truthful. *See generally id.* TFO Connelly and Detective Nocerino ended the conversation and left the hotel shortly after 3:00 p.m.

## <u>Argument</u>

The thrust of the defendant's argument is that law enforcement officers purposely sought to confine him to Beth Israel's emergency department to delay making a formal arrest and, in turn, interview him without having to administer *Miranda* warnings. This argument is not supported by the facts. Saying nothing of the fact that he was not arrested until nearly three weeks *after* the interviews, the defendant was hospitalized—without any objection from him—at the recommendation of paramedics and hospital personnel, not law enforcement. Nothing about the hospital setting, the officers' conduct during the interviews, or the totality of other circumstances suggests that a reasonable person would have believed he could not terminate the interviews.

Because the interviews were not custodial, therefore, there was no requirement that the officers administer *Miranda* warnings.  Likewise, the totality of the circumstances, including the defendant's unremarkable physical and mental condition during the interviews, establish that the defendant's statements were voluntary.

I.    ***Miranda* Warnings Were Not Required Because a Reasonable Person Under the Circumstances Would Have Believed He Was Free to Terminate the Interviews or Cause the Officers to Leave.**

It is well established that law enforcement officers must give *Miranda* warnings before interrogating an individual who is "taken into custody or otherwise deprived of his freedom of action in any significant way." *Stansbury v. California,* 511 U.S. 318, 322 (1994) (internal quotation marks omitted).  In the absence of a formal arrest, whether an individual is in *Miranda* custody depends on whether there is a "restraint on freedom of movement of the degree associated with a formal arrest." *Maryland v. Shatzer,* 559 U.S. 98 (2010) (internal quotation marks omitted). The determination involves two distinct inquiries: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane,* 516 U.S. 99, 112 (1995).  "When an individual is unable to leave the place of the interrogation solely due to circumstances incident to medical treatment, the question is said to be slightly different: whether he or she was at liberty to terminate the interrogation and cause the [officers] to leave." *United States v. Infante*, 701 F.3d 386, 396 (1st Cir. 2012) (internal quotations marks omitted) (citing cases).

Although the inquiry into whether an individual is in custody for purposes of *Miranda* is one of the totality of the circumstances, courts have identified several relevant factors including "whether the suspect was questioned in familiar or at least neutral surroundings, the number of

law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." *Id.* (internal quotations marks omitted). These and other relevant factors weigh in favor of a finding that the defendant's interviews were not "custodial" for *Miranda* purposes.

To begin with, the defendant's hospitalization and the subsequent police investigation was brought about by his own 9-1-1 call, in which he reported being the victim of an apparent explosion. When paramedics encountered the defendant at Northeastern, he did not decline treatment or indicate that he did not want to go to the hospital. What's more, it was paramedics who made the decision to bring the defendant to the hospital—not law enforcement—and no law enforcement officers escorted the defendant there either in the ambulance or otherwise. When the defendant arrived at the hospital, he again did not refuse treatment or ask to be discharged, and there is no evidence that any law enforcement officer extended his hospital stay in any way. Under these circumstances, the hospital was a decidedly neutral setting. *See United States v. Infante*, 701 F.3d 386, 397 (1st Cir. 2012) (finding hospital room a neutral setting where defendant "went to hospital of his own accord to receive treatment for his injuries"); *United States v. Casellas*, 149 F. Supp. 3d 222, 240 (D.N.H. 2016) (hospital room deemed neutral setting where police were "not involved" in defendant's hospitalization); *United States v. Martin*, 781 F.2d 671, 673 (9th Cir. 1985) (finding defendant not "in custody" during hospital interview where law enforcement not involved in defendant's hospitalization and did nothing to extend his hospital stay).

The other relevant facts and circumstances likewise establish that the defendant was not in custody for purposes of *Miranda*. *First*, during both interviews—the BPD interview and the subsequent JTTF interview—only two plain clothes officers were present. *See United States v. Quinn*, 815 F.2d 153, 157 (1st Cir. 2011) (finding no custodial interrogation despite presence of

five officers); *United States v. Hughes*, 640 F.3d 428, 436 (1st Cir. 2011) (finding no custodial interrogation where two plain clothes agents questioned defendant in a small house while two uniformed officers waited outside the room); *Infante*, 701 F.3d at 397 (finding no custodial interrogation where two officers interviewed defendant in hospital room).   *Second*, the interviewing officers did not touch the defendant, restrain his movement, or otherwise indicate that he was not free to leave.   *See Infante*, 701 F.3d at 398 (considering lack of physical contact by interviewing officers in support of no-custody finding); *Hughes*, 640 F.3d at 436 (same).   While hospital staff may have restricted the defendant's movement in order to evaluate him and provide medical care, that should not be a factor in the Court's custody analysis.   *Infante*, 701 F.3d at 398; *Jamison*, 509 F.3d 628 ("[T]o the extent the defendant felt constrained by his injuries, the medical exigencies they created … should not factor in our [custody] analysis.")

Additionally, as both the transcripts and the audio recordings reflect, the interviews were professional and conversational.   The fact that TFO Connelly at times pointed out inconsistencies and other confusing aspects of the defendant's statement was hardly unexpected and did not render the interview "custodial."   Indeed, TFO Connelly's probing questions were precisely the type of "prudent course of conduct [by a diligent investigator] a reasonable person might expect after initiating a police investigation."   *See United States v. Jamison*, 509 F.3d 623, 631-32 (4th Cir. 2007) (concluding probing and accusatory questions did not render interview custodial).   For his part, the defendant did not interpret TFO Connelly's probing questions as a signal that he was somehow not free to terminate the interview.   Near the end of the interview, in fact, he told TFO Connelly, "I absolutely know this is not personal, and I don't mind the, the grilling or whatever.   I get it, you know, this is your job…."   The defendant's responses during the interview, in other

words, reflect the fact that Connelly's questions were reasonable and expected, particularly in response to a claim of an explosive device on a college campus.

Finally, the duration of the interviews is not indicative of custody. The initial BPD interview lasted just fourteen minutes. *See Infante*, 701 F.3d at 398 (describing interviews of twenty-six and twenty-one minutes as "relatively short" and non-custodial). And while the JTTF interview was longer, lasting approximately ninety minutes, its duration was eminently reasonable under the circumstances and supports a finding that the interview was non-custodial. *See United States v. Swan*, 842 F.3d 28, 33 (1st Cir. 2016) (finding ninety-minute encounter at sheriff's office was not custodial); *Hughes*, 640 F.3d at 437 (citing "relatively short" interview of ninety minutes in support of finding that interview of defendant by four officers was non-custodial). The ninety-minute duration of the interview is especially benign considering the relaxed, conversational tone of the interview.

In sum, the totality of the circumstances firmly establishes that a reasonable person would have felt free to terminate both the BPD and JTTF interviews. The interviews occurred in a neutral setting in response to the defendant's claim of an explosive device on the NEU campus. There were only two plain clothes officers present during each interview, none of whom was visibly armed. The officers did not touch the defendant or restrain him in any way. The interviews were conversational and reasonable in length. Consequently, the officers were not required to administer *Miranda* warnings at any point before or during the interviews.

## II. The Defendant's Statements Were Voluntary Within the Meaning of the Due Process Clause.

The defendant's statements during the BPD and JTTF interviews were voluntary within the meaning of the Due Process Clause and not the product of coercion by the officers. "The Supreme Court has admonished that 'a defendant's mental condition, by itself and apart from its

11

relation to official coercion,' can never serve as a sufficient basis for a finding of involuntariness." *Hughes*, 640 F.3d at 437-38 (quoting *Colorado v. Connelly*, 479 U.S. 157, 164 (1986)); *and see United States v. Boskic*, 545 F.3d 69, 78 (1st Cir. 2008) (quoting *Connelly*, 479 U.S. at 167 ("coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fifth Amendment.")).  As the First Circuit has explained, this represents a shift in Supreme Court jurisprudence – whereas the requirement that admissible confessions be voluntary previously reflected a number of values, including protecting the suspect's free choice whether to confess, after *Connelly*, "only confessions procured by coercive official tactics should be excluded as involuntary." *Boskic*, 545 F.3d at 78 (quoting *United States v. Byram*, 145 F.3d 405, 407 (1st Cir. 1998)).  Determining whether improper police coercion occurred depends on the totality of circumstances.  *Byram*, 145 F.3d at 406.

Here, the defendant argues that nature and circumstances of the interview coupled with the defendant's "weakened mental state" combined to render his statements involuntary.  This claim finds no support in the facts or the law.   Coercive conduct sufficient to render a statement involuntary typically must include threats of retaliation, threats of violence, or evidence of consciously misleading conduct on the part of federal agents.  *United States v. Flemmi*, 225 F.3d 78, 92 (1st Cir. 2000) (citing *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963)); *United States v. Rosario–Diaz*, 202 F.3d 54, 69–70 (1st Cir. 2000); and *United States v. Swint*, 15 F.3d 286, 290–91 (3rd Cir. 1994).  None of these elements is present in this case.  Even if the BPD detectives or the TFO Connelly *had* employed deception during the interviews—there is no allegation by the defendant that they did—the "use of chicanery does not automatically undermine the voluntariness of a confession."  *Hughes*, 640 F.3d at 439 (1st Cir 2011) (holding false assurances given to someone with a fragile mental state – and who suffered a panic attack in the middle of the interview

– does not constitute coercion).  For the same reasons the interviews were non-custodial, therefore, the Court should find that the nature and circumstances of the interviews do not support a finding of involuntariness.[7] [8]

As for the defendant's "mental condition," his statements during the interviews and the hospital records dispatch with any notion that he was incapable of speaking voluntarily.  As noted above, the hospital records do not indicate that the defendant's mental capacity was in any way compromised.  While he claimed to suffer from occasional memory loss at the outset of the JTTF interview, he denied more than once that he was actively suffering from memory loss, answering "it's fine" when asked by TFO Connelly how his memory was.  Def. Memo. Exhibit F at 4.  And during the interview itself, the defendant never claimed that he was suffering from memory loss or showed any confusion whatsoever.  To the contrary, the defendant tracked precisely what TFO Connelly was asking him, answering questions in a logical (albeit for many questions, false) manner.  Thus, there is no basis to conclude that the defendant's mental condition rendered his statements involuntary.

---

[7] The defendant's assertion that he was "deprived of essentials, including food, water, and pain medication," *see* Def. Memo at 9, is plainly refuted by medical records and the interviews themselves.  The defendant never asked the agents for food or water, and there is no evidence to suggest that the officers would not have accommodated such a request had the defendant made it.  Furthermore, the medical records establish that medical staff visited the defendant five separate times after the JTTF interview ended, eventually providing him with food, drink, and Tylenol during a sixth visit at 2:16 a.m. (nearly *two hours after the JTTF interview ended*).  *See* Exhibit 3.  There can be no claim, therefore, that the officers' presence in the defendant's room prohibited medical staff from treating the defendant or providing him with food or drink.  Had that been the case, one would expect hospital staff to have provided the defendant with food, drink, and Tylenol immediately after the JTTF interviewed ended at 12:20 a.m, not some two hours and six visits later.

[8] The defendant's reliance *Davis v. North Carolina*, 384 U.S. 737, 740 (1966) is misplaced.  Def. Memo. at 10.  As discussed above, the interviews here were non-custodial.  There was no requirement therefore that the officers administer *Miranda* warnings.

### III.   The Hotel Room Interview on September 14th Was Not Tainted.

The defendant's final argument is that the September 14th interview at the defendant's hotel room in Quincy should also be suppressed because it was "tainted by the earlier unconstitutional interrogations." Def. Memo. at 10-11. However, because the earlier BPD and JTTF interviews complied with *Miranda* (because the interviews were non-custodial) and the Fifth Amendment's Due Process Clause (because the defendant's statements were voluntary), the September 14th interview cannot be "tainted."

But even assuming for the sake of argument that the earlier interrogations somehow *did* violate *Miranda*, that alone does not taint the September 14th hotel interview. It is well-established that the "tainted fruits" doctrine is inapplicable absent a Constitutional violation, and that a *Miranda* violation is not itself a Constitutional violation. *Oregon v. Elstad,* 470 U.S. 298, 308 (1985) (concluding that the "fruit of the poisonous tree" doctrine did not apply to a suspect's second statement, made while in custody as a result of unwarned first statement obtained in violation of *Miranda,* because there was no actual infringement of the suspect's constitutional rights). By itself, therefore, a *Miranda* violation does not trigger the "tainted fruits" doctrine as to a subsequent interview. Because the defendant's statements during the September 14th interview were knowing and voluntary—indeed, the defense does not claim otherwise—there is no basis to suppress them. *See id.* at 310 ("Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.").

Likewise, and for the sake of argument, the alleged Due Process violation, even if it had occurred, also does render the September 14th interview tainted. In determining whether evidence is tainted by a prior violation of constitutional rights, the Court must determine "whether, granting

establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963). Here, there can be little question that the September 14th interview at the defendant's hotel room came about by means sufficiently distinguishable and attenuated from the JTTF interview the night before. Nearly ten hours after the JTTF interview ended, the defendant—of his own accord and from his own hotel room—called the NEU Police Department two times and asked to speak with Detective Nocerino, one of the officers who had interviewed him the night before along with TFO Connelly. When Detective Nocerino and TFO Connelly spoke with the defendant later that day at 2:00 p.m., some fourteen hours *after* the JTTF interview had ended, TFO Connelly told the defendant, "You called us.  We're happy to sit down and talk about whatever you'd like today.  This is your room. If you at any point decide you don't want to talk to us…"  Def. Memo. Exhibit H at 3-4.  The defendant eagerly interrupted TFO Connelly to say, "No, I want to talk to you." *Id*.  Even assuming for the sake of argument, therefore, that there *had* been a Due Process violation the night before, any taint from the alleged violation was plainly dissipated by the passage of time and the defendant purposely initiating further conversation with law enforcement.  *See Wong Sun*, 371 U.S. at 491 (holding unlawful arrest did not taint subsequent written confession where defendant "returned voluntarily" to the police station to make the statement).

## Conclusion

For the foregoing reasons, the government respectfully asks the Court to deny the defendant's Motion to Suppress.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By: /s/     Jason A. Casey
JASON A. CASEY
TIMOTHY KISTNER
Assistant U.S. Attorneys

Date:  July 14, 2023

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Jason A. Casey
JASON A. CASEY
Assistant U.S. Attorney