UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal No. 22-cr-10290-WGY |
| JASON DUHAIME, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The government submits this memorandum in connection with the sentencing of defendant Jason Duhaime, who was convicted in June 2024 after a five-day trial of conveying false information about an explosive device and making false statements to federal agents. The government respectfully recommends that he be sentenced to 12 months and one day prison followed by 24 months of supervised release. Such a sentence is sufficient but not greater than necessary to adequately punish the defendant, promote respect for the law, and achieve general deterrence. The government is not seeking a fine because the defendant does not appear to have the ability to pay one, nor is the government seeking an order of restitution.[1]

## Background and Offense Conduct

In September 2022, the defendant orchestrated a bomb hoax on the campus of Northeastern University, where he was working at the time. From inside a computer lab where he worked, while classes were session, the defendant called 9-1-1 to report that he'd been the victim of a pressurized explosion: that he had opened a plastic Pelican case used to store computer equipment inside a

---

[1] The victim has been advised of its right to restitution pursuant to 18 U.S.C. § 3663A but has affirmatively declined to seek such an order.

storage closet, that "sharp objects" flew out of the case and injured his arms, and that someone had left behind a letter threatening to destroy the lab. The defendant appeared shaken.

The defendant's report generated an enormous law enforcement and medical response that lasted well into the following day. The Northeastern Police Department, Boston Police Department, Mass. State Police, FBI, ATF, and other law enforcement agencies all responded to the scene. After evacuating a portion of Northeastern's campus, the Boston Police bomb squad conducted a controlled explosion of a second case inside the storage closet. Around the same time, law enforcement received multiple additional reports of other suspicious packages on and around campus. The defendant, meanwhile, was decontaminated, rushed to the emergency room, and monitored for potential exposure to harmful chemicals.

The defendant was interviewed twice in the emergency room within hours of the incident, first by Boston Police detectives and later by a federal agent accompanied and a Northeastern detective. In both interviews, the defendant adamantly claimed to be the victim of a pressurized explosion. The injuries to his arms, he said, were caused by sharp objects from inside the case and the threat letter, he claimed, was written by an assailant. The defendant said he saw "strange people" around the lab earlier in the day, but otherwise could not say who was responsible for rigging the case or drafting the letter. As the trial evidence amply proved, however, the defendant wrote the letter in his office, using a computer that he borrowed from the lab, hours before calling 9-1-1. In fact, the entire incident was a hoax orchestrated by the defendant for reasons that remain largely unclear.

The day after the incident at Northeastern, the defendant summoned investigators to his hotel room. Instead of coming clean as the investigators thought he might, the defendant doubled down on his false story, again claiming to be the victim of an attack and offering up fresh theories

about who might be responsible.  Several days later, the defendant was arrested in Texas where he was living with his girlfriend.

## The Advisory Sentencing Guidelines

The government concurs with the Guidelines calculation set forth in the Presentence Report ("PSR").  All three counts of conviction are grouped pursuant to USSG § 3D1.2(b) because they involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan; and pursuant to USSG § 3D1.2(c) because one of the counts of conviction (Counts 2 and 3) embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another count (Count 1).  PSR ¶ 26.  The calculation for Count 1 yields the highest offense level and therefore controls.  *Id.*

The base offense level applicable to Count 1 is 12.  USSG § 2A6.1(a)(1); PSR ¶ 27.  The offense level is increased by four levels pursuant to USSG § 2A6.1(b)(4)(A) because the offense resulted in "substantial disruption of public, governmental, or business functions or services."[2] PSR ¶ 28.  Two additional levels are added under USSG § 3C1.1 because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation and prosecution of the offense of conviction (*i.e.*, the bomb hoax).  PSR ¶ 31.  Accounting for a two-level zero-point offender reduction, the total offense level is 16.  The Guidelines Sentencing Range is 21 to 27 months.

Consistent with Application Note 8 to § 3C1.1, the two-level obstruction enhancement is warranted here.  The defendant engaged in obstructive conduct related to the investigation of the bomb hoax (Count 1) by repeatedly lying to investigators about the Pelican case, the source of the

---

[2] The jury found this enhancement beyond a reason doubt during the trial, as indicated on the verdict form.

marks on his arms, and the supposed threat letter (Counts 2 and 3).  As noted above, by operation of the Guidelines the defendant's obstructive conduct is grouped with the other count of conviction, Count 1.  Because of the grouping rules and in order to account for this obstructive conduct — that is, in order to differentiate under the Guidelines between the defendant who engages in a bomb hoax, and the defendant who engages in a bomb hoax *and* lies about it or otherwise obstructs justice — the Guidelines provide for a two-level obstruction enhancement. Contrary to what the defense might claim, this does not constitute "double counting."  To the contrary, it prevents it.  *See United States v. Yielding,* 657 F.3d 688, 717 (8th Cir. 2011) (observing that grouping "is designed to prevent double-counting by ensuring that the obstructive conduct is taken into account only once: as a two-level adjustment to the base offense level for the underlying offense, or as the offense level provided for the obstruction offense itself") (citation omitted); *see also United States v. Fiore,* 381 F.3d 89, 95 (2d Cir. 2004) (holding that "this [grouping] formula ensures the two-point enhancement does not constitute double-counting because when closely related counts are grouped under section 3D1.2(c), the offense level used is that for the most serious counts") (citation, alterations, and internal quotation marks omitted); *United States v. Maggi,* 44 F.3d 478, 482 (7th Cir. 1995) (rejecting the "implication that the enhancement somehow imposed duplicative punishment for ... obstructive conduct. The enhancement is used merely to determine the applicable Guidelines range") (citation omitted).

### The Government's Recommendation

The defendant's conduct was enormously disruptive and wasteful.  Literally hundreds of Northeastern students and faculty were adversely affected by it, and incalculable law enforcement and medical resources were wasted responding to it.  Portions of Northeastern's campus were closed; students were evacuated from their classrooms and dorm rooms; the computer lab where

the incident occurred was closed from an extended period; literally dozens of law enforcement officials and first responders were summoned to the scene to investigate what they believed (at least initially) was a targeted attack involving an explosive device; a bomb squad was summoned to detonate a second case, which investigators believed (based on the defendant's false claims) contained additional explosives; special precautions were taken to decontaminate the defendant and collect his clothing and other items so they could be tested (at great expense) for explosive residues; and hundreds of hours of investigative time were spent collecting evidence, interviewing witnesses, and otherwise attempting to identify the person or persons responsible for the "attack." But for the defendant's crimes, none of this would have occurred.

The defendant didn't just orchestrate a hoax: he perpetuated it by lying to investigators during multiple interviews. Even worse, the last of these interviews was prompted by the defendant himself, when he unexpectedly summoned investigators to his hotel room in order to talk further. Rather than come clean, the defendant lied for a third time about the incident, even naming specific individuals who he thought might have a motive to harm the lab. The defendant's willingness and ability to lie, and his apparent lack of concern about putting innocent people — including young students — in the crosshairs of a federal investigation, demands an incarcerative sentence.

An incercerative sentence is also needed to achieve general deterrence. Bomb hoaxes, swatting, and other similar incidents have unfortunately become commonplace on college campuses and elsewhere. Despite their frequency, these events are nonetheless highly disruptive

and cause fear and concern in the community. A meaningful sentence that includes a period of incarceration is essential to discourage others from engaging in this type of behavior.

Finally, the sentence recommended by the government is consistent with the sentences received in other similar cases. According to U.S. Sentencing Commission data, between 2019 and 2023 there were 10 defendants nationwide whose primary guideline was §2A6.1, with a Final Offense Level of 16 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. Of those 10 defendants, 8 of them were sentenced to a period of incarceration, with the median length of imprisonment being 15 months. The sentence sought by the government is consistent with this nationwide data, not to mention considerably below the 21 to 27 months called for by the Guidelines.

## Conclusion

The government respectfully asks the Court to sentence the defendant to one year and a day in prison, followed by 24 months of supervised release.

Respectfully submitted,

JOSHUA S. LEVY
United States Attorney

*/s/ Jason A. Casey*
Jason A. Casey
Timothy Kistner
Date: January 9, 2025                              Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Jason A. Casey*
Jason A. Casey
Assistant United States Attorney